# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

**DEBRA JORDAN, as Natural Parent**      :
**and Next Friend of T.S.,**             :
                                         :
      Plaintiff,      :
                                         :
      v.              :  Civil Action No. 5:06-cv-214 (HL)
                                         :
**NASON BLACKWELL, individually,**       :
**and in his Official Capacity as**      :
**Deputy Sheriff of Upson County,**      :
**Georgia, DONALD PEACOCK,**             :
**in his Official Capacity as**          :
**Sheriff of Upson County, Georgia,**    :
**and UPSON COUNTY SHERIFF'S**           :
**DEPARTMENT,**                          :
                                         :
      Defendants.     :
_____

## <u>ORDER</u>

After 13-year-old middle school student T.S. started a fight in the school cafeteria, she was forcibly removed to the principal's office by a school resource officer. In the process, T.S. allegedly sustained a shoulder injury. She brings this claim against the school resource officer, Nason Blackwell; his employer, Donald Peacock, the Sheriff of Upson County, Georgia; and the Upson County Sheriff's Department. After engaging in discovery, Defendants filed the Motion for Summary Judgment (Doc. 20), as amended (Docs. 47 & 51), at issue here. After review of the pleadings, the discovery and disclosure materials on file, and the affidavits, the Court grants, in part, and denies, in part, the Motion, as more fully set forth below.

## I.    FINDINGS

Since November of 1997, Nason Blackwell, an Upson County Sheriff's Deputy, has been working as a School Resource Officer ("SRO") at Upson-Lee Middle School ("Middle School") in Upson County, Georgia.   As a Sheriff's Deputy, Blackwell received standard peace officer training.  (Blackwell Dep. at 26-30.)  As a peace officer, Blackwell is required to take 20 hours of training each year to maintain his peace officer status.  (Blackwell Dep. at 44.)  Blackwell received 80 hours of school resource officer training in Forsyth, Georgia, in 1998.  (Blackwell Dep. at 56-57.)  Blackwell has taken occasional courses geared specifically to SROs over the years.  (Blackwell Dep. at 86.)

As the SRO, Blackwell's duties are part law enforcement, part academic, in that, in the course of his work he counsels students, but he is also responsible for maintaining discipline at the school.  (Blackwell Dep. at 63-64.) Counseling and supervision take up 95% of his duties; law enforcement accounts for the other 5%. (Blackwell Dep. at 65-66.)  Although he works at the school as an SRO, he is employed and supervised by the Upson County Sheriff's Department, and receives his pay from the Sheriff's Department.  (Blackwell Dep. at 52.)

When an incident, such as a fight, occurs at the school, Blackwell may be involved in breaking up the fight, but the ultimate decision as to how to discipline the students involved is left to the school.  Blackwell does have the power to arrest, if necessary, but as a general rule does not act on his authority to arrest unless asked

to do so by the school administration.  (Blackwell Dep. at 66.)  Most student arrests are made by the city police department.  (Blackwell Dep. at 67.)  Blackwell does not act pursuant to any written guidelines for SROs but relies instead on his training as a peace officer and the direction he receives from school officials.  (Blackwell Dep. at 70-71.)

On Thursday, September 8, 2005, Blackwell was in the cafeteria at the Middle School, in his regular capacity as SRO, when T.S. started a fight in the cafeteria with another female student, C.C.[1]  T.S. concedes that she received a threatening note from C.C.; after reading the note during lunch, she approached C.C. after lunch and told C.C. she "didn't appreciate her writing a note about me."  (T.S. Dep. at 82.)  T.S. then pulled C.C.'s hair and, according to T.S. "they started fighting."  (T.S. Dep. at 82.)  T.S. acknowledges that she hit C.C. at least 10 times with almost no return punches from C.C.  (T.S. Dep. at 89.)  At one point T.S. knocked C.C. down but C.C. got back up.  (T.S. Dep. at 94.)  After T.S. had already hit C.C. several times, another student, K.G., took hold of C.C.[2]  (T.S. Dep. at 90.)  T.S. punched C.C. four more times while K.G. was holding C.C.  (T.S. Dep. at 90-91.)  C.C. does not dispute

---

[1] Plaintiff makes much of the fact that before this incident T.S. was a good student who received good grades, and Defendants do not dispute this characterization.  However, the Court fails to see how T.S.'s qualities as a student are in any way relevant to the determinations that must be made here, and thus will not include these facts in its findings.

[2] The parties agree that K.G. was actually trying to help C.C. when he pulled her away, but also agree that onlookers could have gotten the impression that K.G. was actually holding C.C. to prevent her from defending herself.

this series of events except that she denies T.S. said anything before pulling her hair.  (C.C. Dep. at 42-45.)

Blackwell did not see all of the events leading up to the fight and did not see the first part of the fight.  Specifically, Blackwell's perspective of the incident was this:  Blackwell first heard a loud disruption behind him while he was in the cafeteria. (Blackwell Dep. at 120, 125.)  When he turned, he saw a circle of students.  After studying the circle to figure out what was going on, he saw a male student grab a female student, who was C.C., and pull her back.  (Blackwell Dep. at 120, 125-26.) Blackwell then saw T.S. pause briefly to look at C.C. then started hitting her. (Blackwell Dep. at 120, 128.)  He does not know how many times T.S. hit C.C. before he was able to reach them, but he knows that T.S. was still in the process of hitting C.C. when he reached them and moved to separate them.  (Blackwell Dep. at 120.)  Blackwell did not know either girl, except as students, before this incident. (Blackwell Dep. at 118.)

Blackwell stopped T.S. from continuing to hit C.C. by throwing his right arm across the front of her body and wrapping his arm around her.  (Blackwell Dep. at 135.)    The parties dispute whether Blackwell's arm was across T.S.'s neck; Blackwell says it was above T.S.'s breast, in the shoulder region.  (Blackwell Dep. at 135.)  Blackwell denies using a choke hold.  (Blackwell Dep. at 188.)  However, several witnesses say it appeared to them that Blackwell had T.S. in a choke hold. T.S. contends Blackwell had her in a choke hold and she could not breathe.  (T.S.

Dep. at 96.)  The parties also disagree as to whether T.S. was resisting or yelling. T.S. says she was unable to speak (T.S. Dep. at 95), and walked with him without resistance.  (T.S. Dep. at 95.)  Blackwell says she told him to take his hands off her and screamed for him to let go (Blackwell Dep. at 136, 139), and also would have continued swinging had he not been holding her tight.  (Blackwell Dep. 140.)  Other witnesses contend, however, that she made no sound and no movement after Blackwell restrained her.

The positioning of Blackwell's right arm across T.S. forced her left arm across the front of her body, with the left arm up in air.[3]  It was Blackwell's intent to restrain T.S. in such a manner as to prevent her from being able to strike C.C. or anyone else.  (Blackwell Dep. at 138.)  Blackwell walked T.S. approximately 100 feet from the cafeteria to the principal's office while holding her in the same position.  (Blackwell Dep. at 142.)  T.S. agrees that it was not far from the area of the fight to the principal's office.  (T.S. Dep. at 103.)  C.C. testified that the distance was short,

---

[3] The testimony from the witnesses as to which of T.S.'s arms was in the air is unclear.  For example, the affidavits of the witnesses submitted by T.S. say only that the manner in which Blackwell was holding T.S. had the effect of forcing one of her arms to go up.  (Pl.'s Br. Opp'n, Exs. C, D, E, and F.)  Blackwell says T.S.'s left arm was down and her right arm was up in the air.  (Blackwell Dep. at 137.)   It is clear from the video, however, that Blackwell is using only one arm–his right arm–to hold T.S.; that his right arm comes from T.S's right side, across the front, neck area and under her left arm, so that it is T.S.'s left arm that is pinned up above her shoulder, with her left hand and forearm hanging in front of her face and her right arm down by her side.  (Defs.' Mot. Summ. J., Ex. C.)  Contrary to the suggestions made by Defendants in their briefs, the video is not conclusive as to many of the issues in dispute in this case, such as the degree of force applied, or the level of resistance offered by T.S.

about 13 steps.  (C.C. Dep. at 53.)

Blackwell believed that the amount of force he used at first was necessary to maintain control of T.S. (Blackwell Dep. at 194), and that he reduced the level of force as he walked her from the cafeteria to the office.  (Blackwell Dep. at 195-96.) Once at the principal's office, according to T.S, Blackwell "threw" her into a chair. (T.S. Dep. at 109.)  Blackwell says he "released" her into the chair.  (Blackwell Dep. at 144.)  Blackwell is 6 feet 4 inches tall and, in 2005, weighed 260 to 270 pounds. (Blackwell Dep. at 114.)  T.S. was between 5 feet and 5 feet 2 inches  tall and about 110 to 115 pounds on a thin frame;  C.C. was about the same height as T.S. and weighed 5 to 10 pounds more.  (Blackwell Dep. at 122.)

Blackwell did not believe that he had injured T.S.  (Blackwell Dep. at 153.) After the incident, both girls denied having any injury.  (Blackwell Dep. at 154.)  The day after the incident, T.S. complained of pain in her right shoulder.  (T.S. Dep. at 114, 115-16.)  T.S. did not complain of pain in her neck or throat.  (T.S. Dep. at 114.) On the Saturday after the incident she sought medical treatment for the pain in her right shoulder.  (T.S. Dep. at 114-15.)  She reported to the medical personnel that the pain in her right shoulder started on Friday, the day after her right arm was pulled above her head.  (Defs.' Mot. Summ. J., Ex. D)  She did not complain of neck or throat pain at that time.  (T.S. Dep. at 115.)  She was told that her shoulder was fractured.  (T.S. Dep. at 143.)  T.S. wore a shoulder harness strap for 4 to 6 weeks after the incident.  (T.S. Dep. at 116.)  She recalls that she wore the shoulder strap

6

on her left arm.  (T.S. Dep. at 106.)

## II.    PROCEDURAL HISTORY

On June 26, 2006, Plaintiff brought the complaint at issue here.  In her complaint she has named as Defendants Nason Blackwell, individually and in his official capacity as Deputy Sheriff; Donald Peacock, in his official capacity as Sheriff; and the Upson County Sheriff's Department.  Her complaint is brought in eight counts but can more easily be stated as alleging claims under 42 U.S.C. § 1983 for violations of her rights under the Fourth and Fourteenth Amendments and state law tort claims for assault and battery and negligent and intentional infliction of emotional distress.  Having engaged in discovery, all Defendants have moved for summary judgment as to all claims against them.

## III.   CONCLUSIONS OF LAW

### A.    Federal Claims

Plaintiff has framed this case under § 1983 as one for violation of her right to be free from unreasonable and excessive force under the Fourth Amendment (Compl. ¶ 62) and for violation of her rights under the substantive due process clause of the Fourteenth Amendment (Compl. ¶ 85).  She imputes liability to Sheriff Peacock and the Sheriff's Department under failure to train or policy or custom (Compl. ¶¶ 67, 101) and respondeat superior (Compl. ¶¶ 78, 112) theories of liability.  The Court will discuss the liability of each of these entities in turn.

### 1.    Individual Capacity Claims Against Deputy Blackwell

Plaintiff brings claims under 42 U.S.C. § 1983 against Defendant Blackwell in his individual capacity.  Blackwell maintains he is entitled to qualified immunity as to any § 1983 claims brought against him in his individual capacity.  The Court will analyze the individual-capacity claims under a two-step analysis, deciding first whether a constitutional right was violated, and second whether the right violated was clearly established at the time of the incident.[4]

### a.    Underlying Right Violated

The first step in analyzing a § 1983 claim "is to identify the exact contours of the underlying right said to have been violated."  County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5, 118 S. Ct. 1708, 1714 n.5 (1998). Here, Plaintiff alleges Blackwell's acts of placing her in a choke hold violated her Fourth Amendment right to be free from unreasonable and excessive force (Count I) and her substantive due process rights under the Fourteenth Amendment (Count II).  However, Blackwell cannot be liable for the same conduct under both constitutional provisions.  In this regard, the decision in Lewis is instructive:

> Because we have "always been reluctant to expand the concept of substantive due process," Collins v. Harker Heights, 503 U.S. 115, 125, 112 S. Ct. 1061,1068 (1992), we held in Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865 (1989), that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against

---

[4] Plaintiff apparently concedes that Blackwell was acting pursuant to his discretionary authority at the time of the incident as she raises no challenge to this issue.

a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." Albright v. Oliver, 510 U.S. 266, 273, 114 S. Ct. 807, 813 (1994) (plurality opinion of Rehnquist, C.J.) (quoting Graham, 490 U.S. at 395, 109 S. Ct. at 1871) (internal quotation marks omitted).

. . . .

. . . . "Graham simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." United States v. Lanier, 520 U.S. 259, 272, n. 7, 117 S. Ct. 1219, 1228, n. 7 (1997).

Lewis, 523 U.S. at 842-43, 118 S. Ct. at 1714-15.  Thus, before the Court undertakes to analyze this case under the Fourteenth Amendment, it must first determine whether Plaintiff's claim is covered under the Fourth Amendment.

The Fourth Amendment protects against unreasonable searches and seizures. The Supreme Court of the United States has defined a Fourth Amendment seizure as "'a governmental termination of freedom of movement *through means intentionally applied*.'"  Lewis, 523 U.S. at 844, 118 S. Ct. at 1715 (quoting Brower v. County of Inyo, 489 U.S. 593, 596-97, 109 S. Ct. 1378, 1381 (1989)).  As other courts have noted, the decision in Graham "preserve[s] Fourteenth Amendment substantive due process analysis for those instances in which a free citizen is denied his or her constitutional right to life through means other than a law enforcement officials' arrest, investigatory stop or other seizure." Pleasant v. Zamieski, 895 F.2d 272, 276 n.2 (6th Cir. 1990).

In this case, it is undisputed that a governmental actor, Blackwell, acted to terminate, or at least severely limit, T.S.'s freedom of movement through means intentionally applied.  Even Plaintiff's own expert, Robert T. Lacey, agrees that at the point at which Blackwell placed T.S. under his physical control he was acting in his role as a law enforcement officer to terminate her movement.  (Lacey Dep. at 32.) It thus appears to the Court that the Fourth Amendment provides an explicit textual source of constitutional protection and that this case need not be analyzed under the more generalized Fourteenth Amendment substantive due process standard.  *See* Gray ex rel. Alexander v. Bostic, 458 F.3d 1295 (11th Cir. 2006) (analyzing seizure and use of force on student by school resource officer under the Fourth Amendment).

A law enforcement officer's use of physical force pursuant to the Fourth Amendment is considered under a totality of the circumstances standard.  As the Supreme Court has noted, proper application of the test of reasonableness under the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight."  Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989).  Moreover, the reasonableness inquiry in an excessive force case is an objective one.  Thus, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an

objectively unreasonable use of force constitutional." Id. at 397, 109 S. Ct. at 1872 (citing Scott v. United States 436 U.S.128, 138, 98 S. Ct. 1717, 1723 (1978)).

It is clear to the Court that when the facts of this case are analyzed under the foregoing principles, questions of fact remain for determination by a jury as to whether the use of force employed by Blackwell was reasonable under the circumstances.  The evidence in this case, when viewed in the light most favorable to T.S. as the nonmoving party, permits a finding that when Blackwell first perceived C.C. she appeared to be unable to defend herself while T.S. punched her at least four times, so that Blackwell's belief that T.S. posed an immediate threat to C.C. and perhaps others was reasonable, and justified his initial seizure of T.S.

However, the disparity in size between T.S. and Blackwell, and the disagreements among the witnesses with respect to the amount of force that Blackwell actually applied and where he applied it, raise jury questions as to whether the degree of force was reasonable when first applied.  Questions also remain for determination by a jury as to how much force Blackwell continued to apply after he first acted to separate T.S. from C.C. until he released her in the principal's office. And jury questions remain with respect to the degree of force Blackwell used when releasing T.S.  Additionally, jury questions remain with respect to the degree of injury T.S. sustained, and the cause of that injury.  The extent of the injury inflicted is a factor in determining whether an officer's use of force was objectively reasonable. See, e.g., Slicker v. Jackson, 215 F.3d 1225, 1233 (11th Cir. 2000).  When

11

considering the totality of the circumstances, the Court finds that the question of whether Blackwell's use of force was objectively reasonable is for a jury to decide. Moreover, should a jury credit T.S.'s testimony, along with that of her other witnesses, it could find Blackwell's use of force was excessive.

### b.    Qualified Immunity

Having concluded that a jury could find that Blackwell violated T.S.'s Fourth Amendment right to be free from unreasonable and excessive force, the Court must next decide whether Blackwell is entitled to qualified immunity. Qualified immunity shields government officials from liability for civil damages "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038 (1987). Questions of qualified immunity should be resolved at the earliest possible stage of the litigation. Saucier v. Katz, 533 U.S. 194, 200-01, 121 S. Ct. 2151, 2156 (2001). However, because the question of whether a state actor is entitled to qualified immunity is inherently fact-specific, it is oftentimes an issue that cannot be decided by the courts before trial. See Brosseau v. Haugen, 543 U.S. 194, 206-07, 125 S. Ct. 596, 603-04 (2004) (Stevens, J., dissenting) (stating, "Although it is preferable to resolve the qualified immunity question at the earliest possible stage of litigation, this preference does not give judges license to take inherently factual questions away from the jury.").

In this case, the qualified immunity question presented is whether a

12

reasonable law enforcement officer in Blackwell's position on September 8, 2005, could have believed that the degree of force that he exerted on T.S. was reasonable under all of the circumstances present in the school cafeteria. The problem with this analysis, as alluded to above, is that fact questions exist, for example, as to what degree of force Blackwell exerted on T.S., and as to what precisely the circumstances were as to T.S.'s own behavior when the decision was made to apply force. In the face of disputed material facts as to the degree of force applied and the conduct of T.S., the Court cannot make the necessarily fact-specific legal finding as to the reasonableness of Blackwell's actions. As a result, this Court cannot, at this stage of the litigation, make a determination as to whether Blackwell is entitled to the qualified immunity defense as to the claims against him under § 1983 in his individual capacity. *See, e.g.*, Littrell v. Franklin, 388 F.3d 578, 585 (8th Cir. 2004) (recognizing that the issue of qualified immunity "is frequently intertwined with unresolved factual questions" and setting out the procedure the trial court should follow when the issue must go to a jury). Therefore, insofar as Defendants' Motion for Summary Judgment seeks judgment as a matter of law for Blackwell on the issue of qualified immunity, and as to the federal claims against Blackwell in his individual capacity, the Motion is denied.

### 2.    Official Capacity Claims

Plaintiff maintains Defendants Blackwell and Peacock are liable in their official capacities for the violations of her federally protected rights. A § 1983

suit against a government officer in his official capacity is simply a suit against the relevant governmental entity, <u>Kentucky v. Graham</u>, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 3105 (1985), in this case the Sheriff of Upson County.  *See also* <u>Manders v. Lee</u>, 338 F.3d 1304, 1311 (11th Cir. 2003) (finding that, in Georgia, deputies are employees of the Sheriff for purposes of § 1983 litigation).  Thus a suit against Blackwell in his official capacity is merely a suit against the Sheriff of Upson County.  Therefore, the claims against Blackwell in his official capacity are dismissed as redundant.  The Court will address the official capacity claims as having been brought against only Sheriff Peacock.[5]

Plaintiff contends Sheriff Peacock is liable under § 1983 because his policies were the moving force behind the deprivation of T.S.'s constitutional rights. Specifically, Plaintiff argues that Blackwell "was not adequately trained as an SRO in September of 2005."  (Pl.'s Br. Opp'n at 16.)  Plaintiff also argues that Major Daniel Kilgore, who supervised the SRO program, "never adopted or established any job descriptions, policies, procedures or guidelines for the position."  (Pl.'s Br. Opp'n at 16.)  In addition, Plaintiff argues that the Sheriff's Department's "Use of Force" policy did not address the use of choke holds to restrain suspects.  (Pl.'s Br. Opp'n

---

[5] Although Defendants raised the Eleventh Amendment as a defense to suit in their answer (Answer at 3), they have not argued it in their briefs in support of summary judgment.  The question of whether a sheriff is entitled to Eleventh Amendment immunity requires a complex factual analysis to determine whether the sheriff was acting as an arm of the state or as an arm of the county in carrying out the challenged function.  *See* <u>Manders v. Lee</u>, 338 F.3d 1304, 1309 (11th Cir. 2003).  In the absence of any briefing by the parties on this issue, the Court will not undertake the analysis here.

at 17.)  "More importantly,"  according to Plaintiff, "the Use of Force policy did not even address peace officer interactions with children in a school environment." (Pl.'s Br. Opp'n at 17.)  Finally, Plaintiff complains that the "Sheriff's Department had inadequate procedures for reporting incidents involving the use of force." (Pl.'s Br. Opp'n at 17.)

Many of Plaintiff's arguments miss the point.  Even assuming that Plaintiff is correct and that Major Kilgore never adopted a job description, for example, or that the Sheriff's Office failed to require written reports following a use-of-force incident, there is no evidence to suggest that these failures were the moving force behind the constitutional violation alleged to have occurred in this case.  Plaintiff theorizes that had there been, for example, a reporting requirement, Blackwell would have perhaps acted differently in his handling of T.S., but offers no evidence to support this.  There is nothing in the record to suggest that had there been a job description in place, or had Blackwell known he had to file a written report after the incident, that these acts would have had any bearing on the manner in which Blackwell handled T.S.  Thus, these theories cannot provide the basis for failure to train liability against Sheriff Peacock.

The Court finds two of Plaintiff's arguments on the question of whether there was a failure to train to be worthy of further discussion:  (1) whether Blackwell was properly trained as an SRO, and (2) whether the Sheriff's "use of force" policy addressed the use of choke holds to restrain suspects.  The first argument–whether

15

Blackwell was properly trained as an SRO–appears to be foreclosed by the decision

in Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1309 (11th Cir. 2006).

In Bostic, a nine-year-old was detained and handcuffed by her school SRO.

She brought claims against the SRO and the Sheriff in their individual capacities.

The plaintiff argued, among other things, that the SRO received no training

addressing detention of students.  Although labeled as "supervisory liability" claims,

the Eleventh Circuit analyzed the claims against the Sheriff under a failure to train

theory of liability.  Under that theory, the Court held as follows:

> We similarly conclude that the need for training regarding the
> detention of students specifically is not obvious in the abstract and that
> a lack of such training is a "possible imperfection," but not a "glaring
> omission" from a training regimen.  [The SRO] received training, at both
> the police academy and the [Sheriff's Department], on the proper use
> of force and the principles of probable cause.  The failure to provide
> *specific* training regarding the detention of students, in addition to
> general training regarding use of force during detention and arrest, was
> not "so likely" to result in the violation of students' Fourth Amendment
> rights that [the Sheriff] reasonably can be said to have been
> deliberately indifferent to the need for this particularized training without
> any prior notice.

Bostic, 458 F.3d at 1309.

As suggested by the result in Bostic, a plaintiff seeking to recover from a

Sheriff for the conduct of his officer in a school setting must do more than merely rely

on the fact that it was a school setting.  Such a plaintiff must show that there was an

obvious need for specialized training for that officer demanded by the school setting.

Plaintiff's showing fails in this regard.  Plaintiff has offered no evidence showing that

Sheriff Peacock should have been on notice of a need for particularized training inside the middle school environment.  Perhaps, because the majority of people in a middle school range in age from 11 to 15, Plaintiff would ask the Court to presume that Sheriff Peacock should have known that there was a particularized need for training SROs in the use of force on children of that age.  The problem with such a presumption, however, is that failure to train liability cannot be predicated on such presumptions.[6]

A § 1983 claim for failure to train exists "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  City of Canton v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204 (1989).  Failure to train only becomes "deliberate" where "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need."  Id. at 389, 109 S. Ct. at 1205.  Here, Plaintiff has failed to show that Sheriff Peacock was deliberately indifferent to the need for more SRO training.  Nothing offered by Plaintiff demonstrates that the training of Blackwell related to conduct in a school setting was so obviously inadequate that a

---

[6] It is worth noting that Plaintiff's own expert, Robert T. Lacey, acknowledged that had the same incident, involving the same people, occurred outside of the school environment, Blackwell's duties, liabilities, and actions in breaking up the fight would have been no different than what they were inside the school setting.  (Lacey Dep. at 17.)

constitutional violation was likely to result.

The Court reaches the same result with respect to Plaintiff's argument that Sheriff Peacock should be liable because his "use of force" policy failed to address choke holds.  Plaintiff argues that had there been adequate policies and procedures in place as to the use of choke holds "then a jury could reasonably conclude that Defendant Blackwell would have utilized a less forceful method of restraining T.S. that would not have resulted in an injury." (Pl.'s Br. Opp'n at 18.)  Plaintiff's argument misses the mark, however, because the issue with respect to failure-to-train liability is not simply whether better training would have prevented the injury complained of, but whether the need for more specialized training on the use of choke holds was so obvious that in failing to provide it, the Sheriff was deliberately indifferent to the need for it and, that in failing to provide it, a constitutional violation was likely to occur.  *See, e.g.*, Riley v. Newton, 94 F.3d 632, 638 (11th Cir. 1996) (reversing district court for placing the burden on the defendants to show that their deficient training did not cause the injury and, instead, requiring the plaintiff to show that the need for the training was obvious).

Here, Plaintiff has failed to show that the need for training of the SRO on the use of choke holds was obvious and known to Sheriff Peacock prior to this incident. Plaintiff has not offered any evidence showing that the Sheriff was on notice of a problem with the use of choke holds.  In fact, Plaintiff's expert testified that the basic Georgia police training that Blackwell received was most likely adequate training on

18

the use of choke holds.  (Lacey Dep. at 51.)  In the absence of any evidence showing the Sheriff was on notice of a problem, the Sheriff is entitled to summary judgment.

In view of all of the foregoing, the Court finds that Plaintiff has failed to come forward with evidence sufficient to show that fact issues exist with respect to whether Sheriff Peacock failed to train Blackwell in such a manner as to deprive Plaintiff of her constitutional rights.  Accordingly, as to the question of failure to train, Sheriff Peacock is entitled to judgment as a matter of law.  Defendants' Motion for Summary Judgment is granted as to the claims under § 1983 against Sheriff Peacock in his official capacity.

### 3.    Upson County Sheriff's Department

It is well-established that "[s]heriff's departments and police departments are not usually considered legal entities subject to suit."  Dean v. Barber, 951 F.2d 1210, 1214 (11th Cir. 1992) (holding sheriff's department lacked capacity to be sued under Alabama law).  In several unpublished opinions, the United States Court of Appeals for the Eleventh Circuit has extended the holding in Dean to sheriff's departments and police departments in Georgia.  *See, e.g.*, Lovelace v. Dekalb Cent. Prob., Case No. 04-16688, 2005 WL 1813341 (11th Cir. Aug. 3, 2005) (holding Dekalb County Police Department is not a legal entity subject to suit); Lawal v. Fowler, Case No. 05-15895, 2006 WL 2640222 (11th Cir. Aug. 10, 2006) (holding Douglas County Sheriff's Department is not a legal entity subject to suit). Pursuant to these authorities, therefore, the Court finds the Upson County

19

Sheriff's Department is not a legal entity subject to suit.  Moreover, any claims against the Upson County Sheriff's Department would be redundant of claims brought against Upson County Sheriff Peacock in his official capacity.  Therefore, all claims brought against the Sheriff's Department are hereby dismissed.

### B.   State Law Claims

In addition to her federal claims against Defendants, Plaintiff brings state law claims for assault and battery (Count III), negligent infliction of emotional distress (Count IV), and intentional infliction of emotional distress (Count V).  Plaintiff has characterized her claims as against "All Defendants."  However, the claims against Sheriff Peacock and the Upson County Sheriff's Department appear to be premised on a theory of respondeat superior.  (Compl. ¶¶ 123, 124, 129, 135.)  The Court will address the claims against these Defendants separately.

### 1.   Upson County Sheriff's Department

As noted previously in this Order, under Georgia law, the Upson County Sheriff's Department is not a legal entity subject to suit.  Therefore, as with the federal claims brought against the Sheriff's Department, the state law claims against it are dismissed.

### 2.   Defendant Blackwell

Defendant Blackwell  contends he is entitled to official immunity as to the state law claims brought against him in his individual capacity.  The Georgia Constitution of 1983 provides as follows with respect to the issue of

individual liability:

> Except as specifically provided by the General Assembly in a State Tort  Claims Act, all officers and employees of the state or its departments and agencies may be subject to suit and may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions. Except as provided in this subparagraph, officers and employees of the state or its departments and agencies shall not be subject to suit or liability, and no judgment shall be entered against them, for the performance or nonperformance of their official functions.   The provisions of this subparagraph shall not be waived.

Ga. Const. of 1983, Art. I, Sec. II, Para. IX(d) (LexisNexis 2007).  This provision applies to sheriff's deputies.  *See, e.g.*, Daley v. Clark, 638 S.E.2d 376 (Ga. Ct. App. 2006).

The Supreme Court of Georgia has construed the term "official functions" in Paragraph IX(d) "to mean any act performed within the officer's or employee's scope of authority, including both ministerial and discretionary acts." Gilbert v. Richardson, 452 S.E.2d 476, 483 (Ga. 1994).  The court thus concluded in Gilbert that Paragraph IX(d) permits damage suits against government officers and employees for failure to perform ministerial duties; but where the act complained of arises from the performance of a discretionary function, such officers and employees, with limited exceptions, are immune from negligence claims.  Id.  *See also* Nelson v. Spalding County, 290 S.E.2d 915, 918 (Ga. 1982); Banks v. Happoldt, 608 S.E.2d 741, 744 (Ga. Ct. App. 2004) (citing Nelson).  The protection afforded to government officers

and employees performing discretionary actions is referred to as official immunity, or qualified immunity.  Cameron v. Lang, 549 S.E.2d 341, 344 (Ga. 2001).  In order for an official's discretionary actions to be protected under the doctrine of official immunity, they must have been taken within the scope of the actor's official authority, and done without wilfulness, malice, or corruption.  Id.

In analyzing a state tort claim against an official in his individual capacity, therefore, the first step is to determine whether the actions giving rise to the claim were ministerial or discretionary.  These terms have previously been defined by the Georgia appellate courts:

> A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty.  A discretionary act calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.  Procedures or instructions adequate to cause an act to become merely ministerial must be so clear, definite and certain as merely to require the execution of a relatively simple, specific duty.

Happoldt v. Kutscher, 567 S.E.2d 380, 382 (Ga. Ct. App. 2002) (footnotes and citations omitted).

Plaintiff appears to concede that the challenged actions of Blackwell were taken pursuant to his discretionary authority.  With respect to the question of the liability of Defendant Blackwell in his individual capacity on the state law claims, however, Plaintiff argues there are questions of fact for a jury to decide with respect to whether Blackwell acted with malice or intent to injure in the performance of his

official function.  The Court disagrees.

In the first case to construe the term "actual malice" in the context of official immunity, the Supreme Court of Georgia held that the term "actual malice" requires deliberate intention to do wrong.  Merrow v. Hawkins, 467 S.E.2d 336, 337 (Ga. 1996).  In Merrow, the court rejected the trial court's decision to interpret the words "actual malice" to include a "reckless disregard for the safety of others." Id.  In reaching its result, the court emphasized that Paragraph IX(d) used the term "actual malice" rather than mere "malice" and, as such, was more akin to the "express malice" or "malice in fact" found in criminal law.  Id. at 338.  The court expressly rejected liability against officers and employees acting with implied malice in the performance of their official functions.  Id.

Since the decision in Merrow, the Supreme Court of Georgia has continued to impose a heavy burden on plaintiffs seeking to recover against government officers under a theory of actual malice.  In Kidd v. Coates, 518 S.E.2d 124 (Ga. 1999), the court emphasized the distinction between "actual intent to cause injury, which the court construed to mean "an actual intent to cause harm to the plaintiff" and an intent to do the act resulting in the injury.  The court concluded that merely intending to commit the act that results in injury is not sufficient; a plaintiff must also show that the defendant intended the harm that followed from the act.  Id. at 125. Also in 1999, in Adams v. Hazelwood, 520 S.E.2d 896, 898 (Ga. 1999), the supreme court rejected "the position that proof of 'ill will' is itself enough to establish actual

malice under Art. I, Sec. II, Par. IX (d)."  The court reaffirmed its result in Merrow and reiterated that "in the context of official immunity, actual malice means a deliberate intention to do a wrongful act."  Id.

Given the definition of "actual malice" set out by the Supreme Court of Georgia in Merrow, as reaffirmed in Kidd and Adams, this Court rejects the argument put forth by Plaintiff that Blackwell's actions with respect to T.S. give rise to a showing of actual malice.  No evidence suggests that Blackwell intended the harm that may have resulted to T.S.  In fact, Plaintiff's expert states that it appeared to him that Blackwell was not intentionally trying to harm T.S. but was merely handling her in the wrong manner.  (Lacey Dep. at 38.)  Accordingly, Defendant Blackwell is entitled to official immunity from liability as to the state law claims against him.

### 3.   Sheriff Peacock

In Georgia, a sheriff may be liable in his official capacity for a deputy's negligence in performing an official function.  Gilbert v. Richardson, 452 S.E.2d 476, 484 (Ga. 1994).  Moreover, the official immunity of a public employee, such as a deputy sheriff, does not protect a governmental entity, such as a sheriff, from liability under the doctrine of respondeat superior.  Id.  *See also* Nichols v. Prather, 650 S.E.2d 380, 387 n.9 (Ga. Ct. App. 2007) (noting that even where deputy sheriff would be entitled to official immunity for state law claims against him in his official capacity, the immunity does not extend to the sheriff).  Thus, Sheriff Peacock may not claim the benefit of Deputy Blackwell's official immunity defense.

24

If Plaintiff can show that Blackwell's conduct was tortious, even though he is immune from liability in his individual capacity on the state tort claims, she can still recover from the Sheriff, in his official capacity, for Blackwell's wrongful conduct. Furthermore, the parties have not addressed the elements of the state law claims that are pending, nor have they attempted to apply the facts to the state law claims for a determination as to whether a jury could find Sheriff Peacock liable under a respondeat superior theory.  Thus no determination can be made at this stage of the litigation as to whether Sheriff Peacock would be entitled to judgment as a matter of law on the state law tort claims.  Moreover, because Plaintiff's federal claims remain for determination in this Court, the Court still retains supplemental jurisdiction over the state law claims.  Therefore, Defendants' Motion for Summary Judgment is denied as to Plaintiff's state law tort claims against Sheriff Peacock, in his official capacity, under a theory of respondeat superior liability.

## IV.   CONCLUSION

With respect to Defendants' Motion for Summary Judgment the Court directs as follows:

1. The Motion is denied as to Plaintiff's § 1983 claims against Defendant Blackwell in his individual capacity.

2.  The Motion is granted as to Plaintiff's § 1983 claims against Defendant Peacock in his official capacity.

3.  The Motion is granted as to Plaintiff's state law tort claims against

Defendant Blackwell in his individual capacity.

4.  The Motion is denied as to Plaintiff's state law tort claims against Sheriff Peacock in his official capacity.

5.  Plaintiff's § 1983 claims against Defendant Blackwell in his official capacity are redundant of claims against Defendant Peacock in his official capacity and the official capacity claims against Defendant Blackwell are dismissed.

6.  The Upson County Sheriff's Department is not a legal entity subject to suit and all claims against it are dismissed and it is hereby terminated as a party.

**SO ORDERED**, this the 29th day of September, 2008.


*S/ Hugh Lawson*
**HUGH LAWSON, JUDGE**

mls